**John T. NORTON; Kevin Eikleberry; William M. Heir; Robert L. Nossem; and Charles L. Farguson, Plaintiffs–Appellants,**

v.

**JIM PHILLIPS HORSE TRANSPORTATION, INC., a California corporation, Defendant–Appellee.**

No. 88–2630.

United States Court of Appeals, Tenth Circuit.

July 18, 1989.

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

Larry D. Sather, Denver, Colo., for plaintiffs-appellants.

Robert D. Kinsey, Jr. and Rick A. Damkroger, Nelson & Harding, Lincoln, Neb., for defendant-appellee.

Before MOORE, ANDERSON and BRORBY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Appellants Norton, Heir, Nossem, Farguson and Eikleberry (hereinafter referred to as the "Shippers"), each having an ownership interest in one or more of the eleven horses killed or injured when the horse transport van owned and operated by Jim Phillips Horse Transport, Inc. ("Phillips") overturned, brought this action for damages against Phillips. Phillips asserted its liability was effectively limited because the "released valuation" agreement in the bill of lading expressly limited the liability of Phillips to $200 per horse unless a greater value was declared, and a greater value was not declared. The Shippers allege that Phillips did not effectively limit its liability and is therefore liable for the full value of the horses.[1]

On November 11, 1987 Phillips filed a Motion for Partial Summary Judgment on the issue of whether the liability of the carrier was properly limited to $200 per horse by the bill of lading. The district court, in its Memorandum Opinion and Order of August 16, 1988, granted Phillips' motion. Because the district court's Order was not a final order for purposes of appeal, the parties filed a Stipulated Judgment which was signed and entered by the district court on September 19, 1988. It is from the Stipulated Judgment that the Shippers appeal.

The district court, in granting the Motion for Partial Summary Judgment, held that the bill of lading was in "substantial compliance" with the tariff on file with the Interstate Commerce Commission. *See*

*Robinson v. Ralph G. Smith, Inc.,* 735 F.2d 186, 190 (6th Cir.1984). It also held that both Eikleberry and Blakeney, his groom, were clothed with sufficient authority by the Shippers to contract on their behalf to limit the liability of the carrier for the transport of the horses. And finally, the district court held that the Shippers, through Eikleberry, were given a fair opportunity to choose between two or more different levels of carrier liability. Eikleberry was a trainer who had abundant experience with shipping horses, and was charged by the district court with notice of the terms, conditions and regulations contained in the tariff schedule on file with the Interstate Commerce Commission. *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 108 (1st Cir.1978); *W.C. Smith, Inc. v. Yellow Freight Sys., Inc.,* 596 F.Supp. 515, 517 (E.D.Pa.1983) (shippers are charged with knowledge of tariff rates where they entered into a written agreement limiting the carriers' liability and declined to change the declared value from that referred to in the agreement). Alternatively, the district court, citing *Robinson v. Ralph G. Smith, Inc.,* 735 F.2d at 191, a case similar to this one, held that Eikleberry had an opportunity to choose a liability level through Blakeney, who signed the bill of lading as subagent and failed to declare a higher value for the horses.

On appeal the Shippers allege that the district court erred in granting Phillips' Motion for Partial Summary Judgment because of the existence of several genuine issues of material fact. First, the Shippers allege that there exists a genuine factual issue as to the adequacy of the bill of lading and whether it substantially complied with Phillips' tariff filed with the I.C.C. They claim it was neither adequate nor in substantial compliance with the tariff because: (1) it contained pre-printed valuation figures for the horses and did not afford the shippers the opportunity to declare a higher rate of liability, (2) it listed

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.

App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.

two of the eleven horses on the tenth and last line and therefore was ambiguous, and (3) it was misdated by one day. Second, and closely related to the first issue, the Shippers allege that there is a genuine issue as to whether they were afforded an opportunity to choose between two or more levels of liability. Third, the Shippers allege that there remains a genuine issue as to whether the owners of the horses clothed Eikleberry and Blakeney with sufficient authority to limit the liability of Phillips in the transportation of the horses.

■ The district court, in its comprehensively and ably written Memorandum Opinion and Order, fully restated the facts of this case and extensively reasoned its decision. We see no reason to duplicate the district court's efforts and therefore affirm its decision, for substantially the same reasons as in the attached Memorandum Opinion and Order which is hereby adopted and incorporated into our decision.

■ Three additional points of clarification are worth making however. The Shippers argue that they were denied a reasonable opportunity to choose between different levels of liability, in part because of the fact that the value of $200 per horse was pre-printed on the bill of lading by Phillips. They cite *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1422 (7th Cir.1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988), for the proposition that:

> "[T]he significance of the fact that ... the carrier, rather than the shipper, typed in the valuation figure on the bill of lading is ... only significant when the shipper is not adequately advised concerning the shipper's opportunity to declare a value for his or her goods."

In *Hughes*, the court did not find it significant that the values were pre-typed by the carrier because the shipper was "clearly informed" of the alternate levels of liability available. *Id.* at 1422. Although this issue was not expressly addressed by the district

court it is clear that the fact that the values were pre-printed in no way alters the outcome of this case. We agree with the court in *Flying Tiger Line, Inc. v. Pinto Trucking Serv.*, 517 F.Supp. 1108, 1114 (E.D.Pa.1981), that "[b]y accepting the bill of lading ... with its clear [and pre-printed] statement of released rate valuation of the goods, and by not declaring a greater value [the Shippers] agreed to the terms contained therein." *See also Robinson v. Ralph G. Smith, Inc.*, 735 F.2d at 189–91.

■ Similarly, the Shippers argue that a genuine issue of material fact exists as to whether, under *Anton*, the Shippers made an "absolute, deliberate, and well informed" choice of liability. *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d at 108 (absence of bill of lading or other evidence of written agreement as to released value precluded fair opportunity to choose liability coverage). The Shippers rely in great part on the following language from *Hughes*: "[A]ny limitation of liability must be brought to the attention of the shipper before the contract is signed, and the shipper must be given a choice to contract, with or without, the limitation of liability in the movement of his goods." *Hughes v. United Van Lines, Inc.*, 829 F.2d at 1419–20. They seem to argue that in order for such assent to be valid the shipper or his or her agent must be expressly told orally that the liability would be limited. As discussed by the district court, however, the shipper is charged with knowledge of the terms and conditions of the tariff, particularly if the shipper is experienced, as Eikleberry undisputedly was.[2] *See Mechanical Technology Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085, 1087–88 (2d Cir.1985). Furthermore, because, without declaring a greater value for the goods, the subagent Blakeney signed the bill of lading, which contained express reference to the terms of the released agreement, the shippers are bound by the terms contained in the bill of

---

**2.** The record indicates that Eikleberry admitted that he ships horses by motor carrier approximately every four or five days, that he had seen between 50 and 60 bills of lading and knew that

these bills contained provisions which limited liability to released rate values. Brief of Appellee at 43.

lading even if they were not expressly told that the liability would be limited. *See Robinson v. Ralph G. Smith, Inc.*, 735 F.2d at 191 ("if [the groom] did have authority, apparent or otherwise, to release [the horse] under the bill of lading, then [the shipper] did have a fair opportunity [to choose between different levels of liability because the bill of lading contained express terms]"). *See also Co–Operative Shippers, Inc. v. Atchison, Topeka and Santa Fe Ry.*, 840 F.2d 447, 451–52 (7th Cir.1988). As stated by the Eighth Circuit in *Husman Constr. Co. v. Purolator Courier Corp.*, 832 F.2d 459, 461 (8th Cir.1987):

> "In order for a limitation of liability to be valid under the 'released value doctrine,' the carrier must present the shipper with a reasonable opportunity to declare a value for the shipment above the maximum value set by the carrier, pay an additional fee, and thereby be insured at a higher rate should the shipment go awry. *It is not necessary that an employee of the carrier explain the option to declare a higher value to the shipper. Rather, the carrier must provide only reasonable notice of the opportunity to declare a higher value.*" (emphasis added) (citations omitted).

In *Husman* the shippers were put on notice by language on the face of the bill of lading. *Id.* at 461–62. *See also Flying Tiger Line v. Pinto Trucking Serv.*, 517 F.Supp. at 1114 ("The requirement of a written agreement ensures that the shipper is making an 'absolute, deliberate and well-informed choice' to accept released rate valuation in exchange for lower rates charged by the carrier.").[3] The bill of lading in this case gave the shippers such a choice.

The cases cited above are in no way inconsistent with *Hughes*. It just happened that in *Hughes* the carrier had a discussion with the homeowner-shippers about the limitation of liability and the released rate arrangements and sent them information in the mail.

Finally, the Shippers argue that the district court erred in relying on Restatement (Second) of Agency § 80 (1958) to infer the authority to appoint Blakeney as a subagent. In pertinent part Section 80 provides:

> "Unless otherwise agreed, authority to appoint a subagent is inferred from authority to conduct a transaction for the principal for the performance of which the agent is to be responsible to the principal if:
>
> .      .      .      .      .
>
> (d) the appointment of subagents for the performance of such transactions is usual, or the principal has reason to know that the agent employs subagents."

Comment (a) to § 80 provides, in pertinent part, that:

> "The inference stated in this Section exists only if the agent has undertaken the transaction by his own means and if he reasonably believes, in view of the circumstances under which he undertakes it or which arise during performance, that the principal is willing that it be performed by one other than himself."

The district court did not address comment (a) to section 80. The Shippers allege that there is a genuine issue of material fact as to whether Eikleberry reasonably believed that the Shippers were willing to allow him to permit Blakeney to ship the horses. They cite Eikleberry's deposition testimony that "Bill Blakeney has nothin' to do with my business shippin' of the part [sic]. That's up to me." Brief of Appellant at 17. However, despite this self-serving testimony of one of the owners and plaintiffs in this case, it is clear that "under the circumstances" which arose during his performance he must have reasonably believed that the Shippers were willing to allow him to permit Blakeney to ship the horses. Eikleberry, a trainer experienced in shipping horses, had to be out of town when the horses were to be shipped. He gave Blakeney the responsibility of ship-

---

**3.** Furthermore, we note that 49 U.S.C. § 10730 allows a common carrier to establish limited liability transportation rates and only requires that there be a "written declaration" or a "written agreement" by the shipper.

ping the horses without making any alternative arrangements with Phillips for him (Eikleberry) to sign the bill of lading or for a greater value to be declared for the horses. Just one month prior to the date of shipping Eikleberry likewise gave Blakeney the responsibility of shipping a horse with Phillips. On that occasion Blakeney also signed the bill of lading. Brief of Appellee at 27. Furthermore, four individuals offered undisputed testimony that it was common practice for a trainer's employees to be given the responsibility of shipping horses and signing the bills of lading. *Id.* at 28.

Accordingly, we AFFIRM the decision of the district court in all respects.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civ. A. No. 86–A–2582

Filed August 16, 1988

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

This matter is before the Court on defendant's motion for partial summary judgment. The parties have submitted briefs, affidavits and other documentation in support of their respective positions on this motion, and oral arguments were heard.

### BACKGROUND

On August 28, 1986, defendant's van, while enroute to Colorado, overturned in Nebraska causing serious injury and/or death to plaintiff's eleven thoroughbred racehorses. Plaintiffs filed this action seeking compensation for their resulting losses and damages.

The eleven thoroughbreds had been stationed at the AK–SAR–BEN racetrack in Omaha, Nebraska. The plaintiffs wished to transport their horses to Colorado upon the conclusion of the Omaha meet. Plain-

tiffs John T. Norton ("Norton"), William M. Hier ("Hier"), Robert L. Nossem ("Nossem"), Kevin Eikleberry ("Eikleberry"), and Charles L. Farguson ("Farguson") each had an ownership interest in one or more of the racehorses. Eikleberry, in addition to owning several of the horses, was employed by Hier and Norton as a trainer prior to the accident. Eikleberry had also agreed to train for Farguson after the Omaha meet. Farguson arranged for Eikleberry to pick up his horse and transport it to Colorado. Eikleberry has never been employed by Nossem. Nossem's trainer had contacted Eikleberry to request that Eikleberry arrange for the transportation of Nossem's horse to Colorado, to which Eikleberry agreed.

Several weeks before the accident a meeting took place between Jim Phillips ("Phillips"), the president of defendant Jim Phillips Horse Transportation, Inc., ("Phillips, Inc."), and Eikleberry. It was orally agreed at this meeting that Phillips, Inc., would transport an undetermined number of horses from Nebraska to Colorado for Eikleberry.

Eikleberry left Nebraska before the horses were loaded. On the morning of August 28, 1986, William Blakeney ("Blakeney") was in custody of the eleven horses. Blakeney was employed by Eikleberry as a groom. The previous evening Eikleberry had instructed Blakeney which horses were to be loaded onto the Phillips, Inc., truck.[1] After the horses were loaded, Blakeney signed the defendant's bill of lading. The bill of lading expressly limited liability to $200.00 per head unless a greater value was declared by the shipper.

Defendant moves for a partial summary judgment to limit any liability to $200.00 per head based upon the bill of lading limitation.

### DISCUSSION

■ The Carmack Amendment to the Interstate Commerce Act imposes absolute

1. Included in the eleven horses were two which were trained by Dave Anderson, one owned by Farguson and the other apparently owned by

Ken Thielen who is not a party to this suit. Anderson transferred both horses to Eikleberry prior to August 28, 1986.

liability upon carriers for all loss or injury to property caused by the carrier. 49 U.S.C. § 11707(a)(1). However, carriers are permitted to limit their liability pursuant to section 10730. 49 U.S.C. § 11707(c)(4). A carrier may limit its liability by taking four steps: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988), (citing *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir.1978)).

Plaintiffs argue that the defendant failed to effectively limit liability to $200.00 per horse for three reasons. First, plaintiffs contend that the bill of lading did not comply with the tariff on file with the Interstate Commerce Commission. Second, plaintiffs assert that the defendant failed to obtain the shipper's agreement as to his choice of liability. Finally, it is argued that defendant failed to give the shipper a reasonable opportunity to choose between higher and lower rates.

## I. Adequacy of the Bill of Lading

By allowing carriers to set low declared value shipping rates Congress has made it possible for shippers to decide for themselves the level of risk that they wish to accept. The shipper has the option of assuming the risk of loss in excess of the declared or released value or insuring the cargo through an alternative insurer. Congress intended to encourage price flexibility and reduce unnecessary federal regulation. *Robinson v. Ralph G. Smith, Inc.*, 735 F.2d 186, 190 (6th Cir.1984); H.R.Rep. No. 96–1069, 96th Cong.2d Sess., 25–26, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2283, 2307–08.

The Seventh Circuit Court of Appeals has adopted a substantial compliance rule as a means of meeting Congress' objectives.[2] *Robinson v. Ralph G. Smith, Inc.*, 735 F.2d at 190. According to this rule a carrier may effectively limit its liability by providing a bill of lading which substantially complies with the tariff.

> This rule will encourage interstate carriers to establish rates in ICC tariffs without fear of heavy liability if they fail to strictly comply with the directions of their tariffs. At the same time, this rule will adequately protect shippers by requiring that their shipping options are clearly spelled out in the bill of lading. The carrier will bear the burden of showing that the bill of lading is in substantial compliance.

*Id.*

■ Phillips, Inc.'s bill of lading is clearly in substantial compliance with its tariff. Defendant's tariff, Item No. 360, entitled "Bill of Lading—Uniform Livestock" includes the following language:

> THE AGREED OR DECLARED VALUE OF THE PROPERTY IS HEREBY SPECIFICALLY STATED BY THE SHIPPER TO BE NOT EXCEEDING _____ PER ANIMAL(S).

The bill of lading provides the following language set out in capital letters in a separate paragraph:

> SHIPPERS ARE REQUIRED TO DECLARE IN WRITING THE AGREED OR RELEASED VALUATION OF EACH ANIMAL.

In addition, the bill of lading includes two columns under a heading "Description and declared Value of Each Animal." One of the columns is blank while the other contains a pre-printed value of $200.00. Shippers may cross out the pre-printed value and write a declared value directly above or write the declared value in the adjacent blank column. The tariff and the bill of lading contain essentially identical explana-

---

2. Other courts have suggested that substantial compliance is sufficient. *American Railway Express Co. v. Lindenburg*, 260 U.S. 584, 43 S.Ct. 206, 67 L.Ed. 414 (1923); *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407; *Strickland Transportation Co. v. United States*, 334 F.2d 172 (5th Cir.1964); *Glickfeld v. Howard Van Lines*, 213 F.2d 723 (9th Cir.1954).

tions of the formula for use in calculating an increased shipping rate based on a declared value exceeding $200.00.

Plaintiffs rely on *Caspe v. Aaacon Auto Transport, Inc.,* 658 F.2d 613 (8th Cir. 1981), in support of their argument that a lack of strict compliance is fatal to the defendant's limitation of liability. In *Caspe,* the court of appeals affirmed the district court's holding that a $50.00 limitation on personal liability by the defendant automotive transport company was invalid for failure to fully comply with the tariff. The tariff called for a limitation clause printed in bold-face type. The court decided that defendant's bill of lading failed to direct the shipper's attention to the limitation clause because the entire agreement was in densely packed bold-face type and there was no space provided for the shipper to declare the value of the property. *Id.* at 615–16. The infirmities noted in *Caspe* do not exist in this case. The limitation clause is set out in a separate paragraph in capital letters such that one's attention is immediately drawn to the provision. In addition, there is adequate space for the shipper to declare a property value.

Although the tariff and the bill of lading are not identical, the bill of lading clearly spells out the shipper's options in a manner which conforms with the terms of the tariff. Because the bill of lading is in substantial compliance, plaintiffs may not avoid the liability limitation on this basis.

## II. Shipper's Agreement as to Choice of Liability

■ Plaintiffs properly argue that a carrier cannot limit liability by implication. "There must be an absolute, deliberate and well-informed choice by the shipper." *Anton,* 591 F.2d at 108. The shipper must make the declaration or agreement. *Caten v. Salt City Movers & Storage Co.,* 149 F.2d 428, 432 (2d Cir.1945). Plaintiffs argue that, in this case, there has been no such declaration or agreement. Under an agency theory plaintiffs Norton, Hier, Nos-

sem and Farguson complain that neither Eikleberry nor Blakeney had the authority to enter into a contract that would limit liability.

"To establish that an agent had apparent authority to bind its principal it must be shown that the principal knowingly permitted the agent to exercise the authority in question, or in some manner manifested its consent that such authority be exercised." *Travelers Insurance Co. v. Morrow,* 645 F.2d 41, 44–45 (10th Cir.1981). While it is disputed whether all plaintiffs knowingly permitted Eikleberry to exercise authority to limit liability, it is clear from the facts that each plaintiff manifested consent by giving custody of their horses to Eikleberry for the purpose of arranging transportation. Hier and Norton had employed Eikleberry as a trainer prior to the date of the accident. Both acknowledge that it is part of a trainer's authority to arrange for the shipment of horses. Farguson had not used Eikleberry as a trainer prior to August, 1986. A week or two before the accident Farguson asked Eikleberry to be his trainer at Phoenix for a horse which at the time was running at AK–SAR–BEN under another trainer. Eikleberry agreed. Farguson admitted that transportation of horses is a part of a trainer's responsibility. Nossem's contact with Eikleberry is somewhat more tenuous. Eikleberry was not Nossem's trainer prior to the accident. Nossem's trainer contacted Eikleberry and requested that Eikleberry make arrangements to transport Nossem's horse to Colorado. Nossem was aware of Eikleberry's involvement. Apparent authority to limit liability arises in this case as a result of each plaintiff (other than Eikleberry himself, of course) giving Eikleberry custody and the authority to ship their horses.[3]

Blakeney acted as a subagent when he signed the bill of lading and therefore bound the plaintiffs to its terms. *See Restatement (Second) of Agency* § 5(1).

Unless otherwise agreed, authority to appoint a subagent is inferred from author-

---

**3.** In regard to plaintiff Nossem, it is not essential that he had knowledge of Eikleberry's involvement. It is enough that Nossem's trainer had authority to arrange for the horse's transportation.

ity to conduct a transaction for the principal for the performance of which the agent is to be responsible to the principal if: ... (d) the appointment of subagents for the performance of such transactions is usual, or the principal has reason to know that the agent employs subagents.... *Id.* § 80.

Defendant has provided affidavits of four experts in the field of transporting horses. Each of these experts has stated that trainers are usually not present when horses are loaded. They have also stated that it is common practice for an employee of the trainer to sign bills of lading. Plaintiffs do not dispute this evidence. Therefore I hold that a trainer has the authority to appoint a subagent to sign bills of lading for the shipment of horses which are under his or her control because the appointment of subagents for the performance of such transactions are usual in the industry.[4]

### III. Reasonable Opportunity to Choose a Rate

Plaintiffs next argue that Eikleberry did not receive a fair opportunity to choose a rate based on varying degrees of risk of loss. Plaintiffs stress that Phillips quoted Eikleberry a single rate in a conversation several weeks before the accident. It is claimed that Phillips did not elaborate with regard to the meaning of the quoted rate and did not explain that Eikleberry had an option to choose a higher rate based on a declared value in excess of $200.

■ "A fair opportunity means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Hughes v. United Van Lines, Inc.,* 829 F.2d at 1419. "[S]hippers are charged with notice of terms, conditions and regulations contained in the tariff schedule pertaining to a carrier's liability which in turn affect the rates charged the carriage of goods." *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d at 108; *W.C. Smith, Inc., v. Yellow*

*Freight Systems, Inc.,* 596 F.Supp. 515, 517 (E.D.Pa.1983). In *W.C. Smith, Inc.,* the plaintiff consignee sued a connecting carrier for losses which resulted from damage to machinery during transportation. The machinery was shipped under a bill of lading which expressly incorporated all tariffs which governed the transportation of the shipment. Although the released rates were not conspicuous on the face of the bill of lading, the court held that the shipper was charged with knowledge of the applicable tariff provisions. "The various rates and corresponding limitation on liability listed in [the carrier's] tariff provided [the shipper] with a fair opportunity to choose between higher and lower liability by paying a correspondingly greater or lesser charge." *Id.* at 517 (citation omitted). Thus in the case at bar, Eikleberry is charged with knowledge of the terms of the defendant's tariff which included the information required to choose a rate based upon varying levels of liability.

■ Alternatively, Eikleberry is charged with having received a fair opportunity to obtain information through the acts of his agent, Blakeney. As previously noted, the bill of lading set out essentially the same formula as defendant's tariff for selecting a rate based upon varying liability. In *Robinson v. Ralph G. Smith, Inc.,* 735 F.2d 186, the court concluded that the plaintiff, who owned and trained a horse injured during shipping, was given a fair opportunity to choose a shipping rate. The plaintiff's groom had released the horse under a bill of lading which limited the carrier's liability to $200.00 unless a higher value was declared. The court decided that "if [plaintiff's groom] did have authority, apparent or otherwise, to release [the horse] under the bill of lading, then [the plaintiff] did have a fair opportunity." *Id.* at 191. In the present case I have held that Eikleberry's groom had authority as a subagent to sign the bill of lading. I therefore hold that Eikleberry received a fair opportunity to choose a rate.

---

**4.** See, *Robinson v. Ralph G. Smith, Inc.,* 735 F.2d 186, 191 (defendant provided ample evidence of apparent authority for groom to sign

bill of lading because such an act was "a routine transaction of the type that an employee in [the groom's] position could carry out.").

Plaintiffs' argument is further weakened in light of the admitted experience of Eikleberry. Eikleberry is an experienced horse trainer who has shipped horses by commercial carrier on many occasions. He admits to seeing 50 or 60 bills of lading. It is undisputed that interstate carriers of horses customarily limit liability to declared values stated in their bills of lading.

■ Plaintiffs cannot effectively contend that Eikleberry was not given a reasonable opportunity to choose between rates. As noted in *Mechanical Technology, Inc., v. Ryder Truck Lines, Inc.,* 776 F.2d 1085 (2d Cir.1985),

> a rule invalidating a limitation or liability where a commercial shipper claims lack of knowledge will lead to overinsurance and to an increase in freight rates. Carriers will have to insure against the risk of litigation over claims by shippers of ignorance of the tariff and against the possible exposure to full liability for damage to or loss of goods of uncertain value. They will in turn have to raise those freight rates which are geared to unreliable limitations of liability. Meanwhile, shippers will also continue to purchase insurance to cover risks above the limitation on liability which they bear as a consequence of the uncertainties of litigation.

*Id.* at 1090 (Winter, J., concurring).

Thus, in order to satisfy Congress' desire for price flexibility in the shipping industry plaintiffs will not be allowed to deny Eikleberry's knowledge of rates nor his opportunity to choose one in this case involving an experienced shipper in an industry which customarily limits liability and where the tariff and bill of lading clearly provided for variable rates.

Here it is clear that the defendant has done all that is required to limit its liability. Defendant's bill of lading substantially complied with the tariff on file with the Interstate Commerce Commission. Defendant obtained the shipper's agreement as to his choice of liability in the form of a bill of lading signed by Eikleberry's employee. Finally, Eikleberry had a reasonable opportunity to choose between two or more levels of liability. Plaintiffs' assertion that

Eikleberry, an experienced horse trainer who has shipped many horses by commercial carriers, was not aware of the industry custom of limiting liability is not persuasive. Even if Eikleberry misunderstood the effect of the liability limitation commonly used by interstate carriers, it would be unfair to place the loss in this case on the carrier. Carriers should not be held to a standard that would impose liability on them due to a unilateral mistake by an experienced shipper. This is not to say that a carrier may mislead an unsophisticated shipper as to the shipper's exposure to liability. However, in a case such as this, ignorance or mistake will not save an experienced shipper from the deal that he has struck.

### CONCLUSION

The Court finds that there are no genuine issues of material fact as to the limitation of defendant's liability. Therefore, it is

ORDERED that defendant's motion for partial summary judgment limiting its liability to $200.00 per animal be, and the same hereby is, granted.

DATED at Denver, Colorado, this 16th day of August, 1988.

BY THE COURT:
/s/ Alfred A. Arraj
ALFRED A. ARRAJ, Judge
United States District Court